# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In Re:

CASE NO.: 6:08-bk-04327-KSJ

MIRABILIS VENTURES, INC.,

CHAPTER 11

    Debtor.

_____/

MIRABILIS VENTURES, INC.,

    Plaintiff,

ADV. PRO. NO.: 6:08-ap-00228-KSJ

v.

JAMES MOORE & CO., P.A., a Florida
Limited liability corporation, and E. JAY
HUTTO, an individual,

    Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, Mirabilis Ventures, Inc., ("MVI" or "Mirabilis"), by and through its undersigned counsel, and pursuant to Rule 7003 and Rule 7015, *Federal Rules of Bankruptcy Procedure*, hereby files its second amended complaint and sues Defendants, JAMES MOORE & CO., P.A., a Florida limited liability corporation ("Moore") and E. JAY HUTTO, an individual ("Hutto")(collectively, "Defendants") and in support states as follows:

## I. NATURE OF THE ACTION

This is an action for compensatory damages against the Defendants stemming from their involvement and representation of MVI. In summation, Defendants were hired by MVI to conduct an audit of Mirabilis's business, including but not limited to,

determining Mirabilis' tax liability. Defendants failed to disclose the subject payroll taxes as a liability for Mirabilis and as a result, Mirabilis has suffered damages.

## II. JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157 because it arises in and is related to a case under Title 11 of the United States Code.

2.     Defendants are subject to the personal jurisdiction of this Court because many of the tortuous acts alleged herein occurred in or were directed to the state of Florida. Furthermore, Defendants are also subject to personal jurisdiction pursuant to 18 U.S.C. §1965(d). Defendant, Moore, is a Florida professional association with its principal place of business located in Alachua County, Florida.

3.     Venue is proper in this district pursuant to 28 U.S.C. §1409, 28 U.S.C. 1391(b), and 18 U.S.C. §1965(c).

4.     This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

## III. THE PARTIES AND OTHER RELEVANT ENTITIES

5.     Plaintiff, MVI, is a Nevada corporation with its principal place of business located at 341 N. Maitland Ave., Suite 210 in Maitland, Florida.

6.     Moore is a Florida limited liability corporation with its principal place of business in Alachua County, Florida.

7.     Upon information and belief, Hutto is a citizen and resident of Alachua County, Florida, and sui juris, who was at all times relevant to the events described herein a Partner, employee and agent of Moore and was acting within the scope of his partnership, employment and that agency.

8.     All conditions precedent to the bringing of this action has occurred, or their performance has been waived by Defendants.

## IV.  THE SUNSHINE COMPANIES

9.     In 2004, Presidion Corporation ("Presidion") entered into a consulting agreement with AQMI Strategy Corporation ("AQMI") to provide consulting work regarding the divestiture and liquidation of certain wholly owned subsidiaries of Presidion.

10.     The Presidion subsidiaries are more commonly know as The Sunshine Companies ("Sunshine Companies").[1]

11.     The deal was an arms-length transaction and both parties were represented by counsel.

12.     During this time, Presidion and the Sunshine Companies had a large amount of outstanding payroll tax liabilities.

13.     AQMI's engagement and proposed resolution centered on the deconsolidation, divestiture and liquidation of the Sunshine Companies.

14.     AQMI's strategy regarding liquidations involved using the funds resulting from the divestiture to pay creditors, including the Internal Revenue Service ("IRS").

15.     The proposed strategy allowed Presidion to deconsolidate its financials and separate itself from the excessive liabilities associated with its subsidiaries, allowing it to continue to conduct business as a going concern ("Sunshine Companies Plan").

---

[1] Consisting of (1) Sunshine Staff Leasing, Inc.; (2) Sunshine Companies II, Inc.; (3) Sunshine Companies III, Inc.; and (4) Sunshine Companies IV, Inc.

16. On or about January 6, 2005, AQMI and its various professionals, met with IRS revenue officer, Judith Berkowitz, to inform the IRS of the estimated tax debt of the Sunshine Companies and the plan for resolution of the debt.

17. The IRS never objected to the plan or otherwise raised any issues regarding the illegality of the Sunshine Companies Plan.

## V. THE PRESIDION REORGANIZATION PLAN AND MIRABILIS VENTURES, INC.

18. On October 28, 2004, the entity known as Stellar Industries, Inc. changed its name to Mirabilis Ventures, Inc. At its inception, Mirabilis had only one shareholder (Yaniv Amar) and only one director (Gailie Hartman).

19. Mirabilis was a private equity company, which acquired companies that had a strategic fit into its unique business model. Acquired companies either fit into the four primary specialization categories – real estate, construction, chain store development, and human resources – or they provided necessary goods and services to the core companies.

20. In May 2005, AQMI was approached again by Presidion regarding further problems with Presidion's remaining professional employer organization ("PEO") operations, particularly Presidion Solutions, Inc. ("PSI") and its wholly-owned PEO operating subsidiaries, Professional Benefits Solutions, Inc. a/k/a Presidion Solutions, VII, Inc. ("PBS") and Paradyme, Inc. ("Paradyme") a/k/a Presidion Solutions, VI, Inc.

21. The problems stemmed from the threatened cancellation of worker's compensation insurance coverage, shortfall of working capital for PEO operations, and a tax liability which had increased to over three million dollars since January 2005.

22. Drawing from what appeared to be the success of the previous Sunshine Companies Plan, AQMI proposed a plan of reorganization designed to restore, preserve and maximize the inherent value of Presidion's assets ("PBS Plan").

23. The PBS plan would utilize Mirabilis, and specifically, AEM, to acquire and rehabilitate the Presidion PEO book of business.

24. A key element of the reorganization plan called for the interim nonpayment of federal employment taxes by PBS.

25. The collected taxes would then be truthfully reported but not remitted.

26. The collected, yet unpaid, taxes would then be used to fund the PEO operations, particularly paying workers' compensation insurance premiums, reorganize advisors and secured creditors.

27. This would allow the business to continue until it was restored to a position wherein it could pay all of its outstanding liabilities, including the outstanding tax liabilities.

28. In order for the PBS Plan to be accomplished, the Sunshine Plan would also have to be finalized, drawing the two plans together.

29. The PBS Plan and Sunshine Plan were then brought to the attention of Mirabilis for consideration.

## VI. RETENTION AND INVOLVEMENT OF MOORE AND HUTTO BY MIRABILIS VENTURES, INC. AND THE APPROVAL OF THE PBS PLAN

30. In 2005, Defendants were retained by Mirabilis to conduct an audit for years ending in 2004 and 2005, and Defendants issued an audit report for Mirabilis which was dated July 17, 2006 (the "Audit Report"). A true and correct copy of the Audit Report is attached hereto as **Exhibit "A."**

5

31. In the Audit Report, the Defendants included an "except for" clause for certain entities which were defined as Variable Interest Entities ("VIE") and the effects they could have on the financial statements.

32. Defendants knew about Mirabilis's plan to potentially acquire some of the VIE, and the details of the PBS Plan, and its impact on the financial statements of Mirabilis, including but not limited to the obligation to pay the payroll taxes as set forth in the PBS Plan.

33. However, upon information and belief, Defendants used this special VIE exception in the Audit Report when it knew or should have known the financial statements were materially misleading.

34. Plaintiff relied on Defendants' Audit Report and its financial statements in deciding to approve and move forward with the PBS Plan. Upon information and belief, and at all relevant times, independent members of Mirabilis' board of directors and/or shareholders would have taken appropriate remedial actions if the Defendants had disclosed the VIE information through the financial statements and Audit Report.

35. From 2005 through 2007, Moore and Hutto were paid thousands of dollars (the "Funds") for audit work given to Mirabilis.

## VII.  THE UNITED STATES OF AMERICA'S CIVIL FORFEITURE ACTION AGAINST MIRABILIS

36. In late November 2006, Mirabilis executives were notified that a federal grand jury investigation had commenced with regard to the operations of Presidion and Mirabilis.

37. Subsequent to this time, the United States of America filed an *in rem* civil forfeiture action against the assets of Mirabilis.

38.     By January 2007, Mirabilis and AEM had laid off all non-key employees, including a number of officers and managers, and had closed a majority of its businesses.

39.     These layoffs allowed Mirabilis to sustain operations and remain current with its taxes.

40.     Unfortunately, news of the federal grand jury investigation and nonpayment of payroll taxes leaked to the press, resulting in several negative articles, which decimated the PEO book of business and destroyed the operations of Mirabilis.

41.     On or about May 1, 2007, Mirabilis' subsidiaries, AEM and National MedStaff sold their PEO businesses to O2HR, LLC for approximately Two Million Five Hundred Thousand Dollars ($2,500,000.00).

42.     On May 27, 2008, the Debtor filed its voluntary petition for relief with the Middle District of Florida Bankruptcy Court (the "Petition Date").

43.     The Chapter 11 filing came primarily as a result of an *in rem* civil forfeiture action filed by the United States of America against certain assets of Mirabilis, which effectively caused Mirabilis to be unable to pursue claims and litigation against various third parties.

44.     The *in rem* civil forfeiture action was filed based upon the criminal investigation of Mr. Amodeo.

45.     In an effort to preserve equity for all of its creditors and other potential creditors, Mirabilis deemed a Chapter 11 liquidation plan as in the best interest of all its creditors.

## VIII.   COUNT I – NEGLIGENCE (ALL DEFENDANTS)

46.    MVI re-alleges and re-states paragraphs 1 through 45 as if fully set forth herein.

47.    At all times material hereto, an accountant-client relationship existed between MVI and Defendants.

48.    By accepting employment to conduct an audit for MVI, Defendants had a duty to use such skill, prudence, and diligence as other accountants and tax professionals of ordinary skill and capacity commonly possesses and exercises in the performance of the tasks they undertake.

49.    Defendants breached their aforementioned duties and deviated from the applicable standards of professional care, by virtue of their conduct described hereinabove, including but not limited to, Defendants failure to advise MVI, its subsidiaries and related companies MVI was responsible for the subject payroll taxes through the issuance of the Audit Report.

50.    As a direct and proximate result of the Defendants' negligence, MVI, its subsidiaries and related companies have suffered damage to their business, property, as well as its creditors, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc., demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## IX.  COUNT II – BREACH OF FIDUCIARY DUTY
## (ALL DEFENDANTS)

51.     MVI re-alleges and re-states paragraphs 1 through 45 as if fully set forth herein.

52.     At all times material hereto, a fiduciary relationship existed between MVI, and Defendants, particularly, an accountant-client relationship existed between MVI, its subsidiaries and related companies and Defendants.

53.     Defendants each breached their fiduciary duties to MVI, by virtue of their conduct described hereinabove, particularly, Defendants each failed to disclose to MVI through its Audit Report and under the VIE exception paragraph, that Mirabilis was responsible for the VIE's tax liabilities and subject payroll taxes.

54.     As a direct and proximate result of Defendants' breach of fiduciary duties, MVI, its subsidiaries and related companies have been damaged in their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc., demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## X.  COUNT III
## NEGLIGENT MISREPRESENTATION (ALL DEFENDANTS)

55.     MVI re-alleges and re-states paragraphs 1 through 45 as if fully set forth herein.

56. This is a cause of action against Defendants for negligent misrepresentation.

57. Defendants knew, or should have known, that MVI, its subsidiaries and related companies were relying on the information supplied and representations and statements made by Defendants through their Audit Report.

58. Defendants owed MVI, its subsidiaries and related companies a duty of reasonable care, skill and diligence to ensure that all of the information supplied and representations and statements made to or on behalf of MVI and its related entities were true and accurate. This duty required Defendants to reasonably investigate the facts pertinent to the representation and provide MVI and its related entities with true and accurate information in connection with their legal representation.

59. Defendants breached their duty by making material negligent misrepresentations and omissions described above when in the exercise of reasonable care should have known facts or circumstances indicating that these negligent misrepresentations and omissions were materially misleading at the time they were made, including those statements and omissions made by Defendants through the Audit Report.

60. As a direct and proximate result of the negligent misrepresentations made by Defendants, MVI, its subsidiaries and related companies have suffered damages to their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc., demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the

maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## XI.  COUNT IV
### PROFESSIONAL NEGLIGENCE (ALL DEFENDANTS)

61.     MVI re-alleges and re-states paragraphs 1 through 45 as if fully set forth herein.

62.     This is a cause of action against Defendants for professional negligence.

63.     As a result of their representations of MVI, its subsidiaries and related companies, Defendants knew or should have known that MVI and its entities were relying on their work product, representations, and statements in the Audit Report in deciding how to operate and conduct their businesses.

64.     Defendants owed a duty to MVI, its subsidiaries and related companies to exercise reasonable care, skill, and diligence in order to ensure that all of the information obtained and supplied to MVI, in connection with their legal representation, was true and accurate.

65.     Defendants breached their duty of care by making the misrepresentations and omissions described above when, in the exercise of reasonable care; they should have known that these misrepresentations were misleading at the time they were made.

66.     As a direct and proximate result of the professional negligence of Defendants, MVI, its subsidiaries and related companies have suffered damages to their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc., demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the

maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## XII.  COUNT V
## NEGLIGENT SUPERVISION (AGAINST MOORE)

67.     MVI re-alleges and re-states paragraphs 1 through 45 as if fully set forth herein.

69.     This is a cause of action against Moore for the negligent supervision of Hutto.

70.     Moore owed MVI, its subsidiaries and related companies a duty to use reasonable care in supervising the conduct and activities of Hutto in connection with their representation of MVI, its subsidiaries and related companies.

71.     Moore breached its duty of reasonable care by failing to supervise Hutto to ensure that his conduct and activities were true and accurate, including but not limited to his work in furtherance of the Audit Report.

72.     As a direct and proximate result of this breach, MVI and its related entities have suffered damages to their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc., demands judgment against Moore: (1) awarding the amount of principal damages incurred by MVI due to Moore's actions and inactions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

Respectfully submitted this 18th day of September, 2009.

/s/ R. Scott Shuker
R. Scott Shuker
Florida Bar. No. 0984469
Jennifer S. Eden
Florida Bar No. 0867594
Latham, Shuker, Eden & Beaudine, LLP
390 North Orange Avenue, Suite 600
Orlando, Florida 32801
Telephone: (407) 481-5800
Facsimile: (407) 481-5801
Attorneys for Debtor/Plaintiff

In Re:

CASE NO.: 6:08-bk-04327-KSJ

MIRABILIS VENTURES, INC.,

CHAPTER 11

    Debtor.

_____/

MIRABILIS VENTURES, INC.,

    Plaintiff,

ADV. PRO. NO.: 6:08-ap-00228-KSJ

v.

JAMES MOORE & CO., P.A., a Florida
Limited liability corporation, and E. JAMES
HUTTO, an individual,

    Defendants.

_____/

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished via U.S. mail to **Charles J. Meltz, Esquire** and **Jeanelle G. Bronson, Esquire**, Grower, Ketcham, Rutherford, Bronson, Eide & Telan, P.A., PO Box 538065, Orlando, Florida 32853-8065 on this 18th day of September 2009.

/s/ R. Scott Shuker
R. Scott Shuker, Esq.

MIRABILIS VENTURES, INC.
AND SUBSIDIARIES

CONSOLIDATED FINANCIAL STATEMENTS
AND INDEPENDENT AUDITORS' REPORT

FOR THE YEARS ENDED
DECEMBER 31, 2005 AND 2004

# MIRABILIS VENTURES, INC. AND SUBSIDIARIES
## TABLE OF CONTENTS
### DECEMBER 31, 2005 AND 2004

|  | Page(s) |
|---|---|
| **Independent Auditors' Report** | 1 |
| **Consolidated Financial Statements** |  |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Operations | 3 |
| Consolidated Statements of Stockholders' Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 – 26 |

**EXHIBIT "A"**

# JAMES MOORE & CO., P.L.
CERTIFIED PUBLIC ACCOUNTANTS
AND CONSULTANTS

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors of
Mirabilis Ventures, Inc.:

We have audited the accompanying consolidated balance sheets of Mirabilis Ventures, Inc. and subsidiaries as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

Except as discussed in the third paragraph, we conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

We did not perform audit procedures on management's determination of variable interest entities and the primary beneficiary of such variable interest entities that may exist because sufficient appropriate audit evidence was not available. Generally accepted accounting principles (primarily Financial Accounting Standards Board (FASB) Interpretation 46(R)(FIN 46(R)) "Consolidation of Variable Interest Entities") require the Company consolidate variable interest entities in which it is a primary beneficiary of such variable interest entities and make various disclosures related thereto. We were unable to satisfy ourselves about management's determination of whether the Company is the primary beneficiary of entities in which it has a variable interest and the adequacy of related disclosures by means of other auditing procedures.

In our opinion, except for the effects of such adjustments, if any, as might have been determined to be necessary had we been able to apply adequate procedures to the determination of whether the Company is the primary beneficiary of entities in which it has a variable interest as described in the third paragraph, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Mirabilis Ventures, Inc. and subsidiaries as of December 31, 2005 and 2004, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*James Moore & Co., P.L.*

Gainesville, Florida
July 17, 2006

-1-

**EXHIBIT "A"**

|  | 2005 | 2004 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 6,099,736 | $ - |
| Restricted cash | 14,750,000 | 993,982 |
| Accounts receivable, net | 12,122,950 | - |
| Unbilled receivables | 3,553,401 | |
| Related party receivables | 6,931,985 | 878,750 |
| Inventory | 66,037 | - |
| Investments | - | 4,407,149 |
| Prepaid expenses and deposits | 1,553,562 | - |
| Other current assets | 24,852 | - |
| Total current assets | 45,102,523 | 6,279,881 |
| **Property and equipment, net** | 2,131,842 | - |
| **Other assets** | | |
| Investments, non-current | 2,226,404 | 1,356,158 |
| Deposits, non-current | 2,442,839 | - |
| Deferred income taxes | 28,431 | - |
| Goodwill | 3,520,872 | - |
| Other intangible assets | 100,105 | - |
| Other non-current assets | 17,333 | - |
| Total other assets | 8,335,984 | 1,356,158 |
| **Total Assets** | $ 55,570,349 | $ 7,636,039 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Accounts payable | $ 6,013,463 | $ - |
| Advance billings | 554,704 | - |
| Related party payables | 28,737 | 830,000 |
| Accrued compensation and benefits | 2,488,061 | - |
| Accrued payroll taxes | 269,393 | - |
| Accrued workers compensation premiums | 227,312 | - |
| Deferred revenue | - | 2,000,000 |
| Income taxes payable | 1,574,866 | 2,252 |
| Lines of credit | 75,274 | - |
| Notes payable, current maturities | 3,609,222 | 1,751,416 |
| Related party notes payable, current maturities | 4,579,852 | - |
| Other accrued liabilities | 292,364 | - |
| Total current liabilities | 19,713,248 | 4,583,668 |
| **Long-term liabilities** | | |
| Long-term notes payable | 9,576,659 | 3,041,891 |
| Long-term related party notes payable | 17,337,640 | - |
| Total long-term liabilities | 26,914,299 | 3,041,891 |
| **Minority interest** | 46,329 | - |
| **Stockholders' equity** | | |
| Class B standard preferred stock, no par value, 1,000,000 shares authorized, 156,750 shares issued and outstanding | 515,625 | |
| Class Z special preferred stock, no par value, 25,000 shares authorized, 6,000 shares issued and outstanding | 6,000,000 | |
| Class A common stock, no par value, 75,000 shares authorized, 100 shares issued and outstanding | 100 | 100 |
| Retained earnings | 2,380,748 | 10,380 |
| Total stockholders' equity | 8,896,473 | 10,480 |
| **Total Liabilities and Stockholders' Equity** | $ 55,570,349 | $ 7,636,039 |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 2 -

**EXHIBIT "A"**

## MIRABILIS VENTURES, INC.
## CONSOLIDATED STATEMENTS OF OPERATIONS
## FOR THE YEARS ENDED DECEMBER 31, 2005 AND 2004

|  | 2005 | 2004 |
|---|---:|---:|
| **Payroll service revenues** | | |
| Revenues, gross | $ 7,296,970 | $ - |
| | | |
| Direct expenses | | |
| Direct wage costs | 6,256,321 | - |
| Payroll taxes | 466,466 | - |
| Benefits and workers compensation | 270,896 | - |
| Payroll service revenues, net | 303,287 | - |
| | | |
| **Construction revenues** | | |
| Construction revenues, gross | 9,658,102 | - |
| Direct construction costs | 8,245,874 | - |
| Construction revenues, net | 1,412,228 | - |
| | | |
| **Consulting revenues** | 21,132,950 | 55,000 |
| | | |
| Sales commissions | 5,622,011 | - |
| | | |
| **Other revenues** | 754,478 | - |
| Total revenues | 29,224,954 | 55,000 |
| | | |
| **Operating expenses** | | |
| Selling, general and administrative expenses | 17,315,098 | 42,368 |
| Depreciation and amortization | 87,291 | - |
| Total expenses | 17,402,389 | 42,368 |
| | | |
| **Operating income** | 11,822,565 | 12,632 |
| | | |
| **Other income (expense)** | | |
| Interest income | 24,003 | - |
| Interest expense | (427,780) | - |
| Equity in earnings (loss) of unconsolidated investees, net | (72,900) | - |
| Investment gain (loss), net | (7,386,734) | - |
| Total other income (expense) | (7,863,411) | - |
| | | |
| **Income before provision for income taxes and minority interest** | 3,959,154 | 12,632 |
| | | |
| **Income tax expense** | (1,544,183) | (2,252) |
| | | |
| **Minority interest** | (44,603) | - |
| | | |
| **Net income** | $ 2,370,368 | $ 10,380 |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

**EXHIBIT "A"**

# MIRABILIS VENTURES, INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### FOR THE YEARS ENDED DECEMBER 31, 2005 AND 2004

| | Class B Standard Preferred Stock | Class Z Special Preferred Stock | Class A Common Stock | Additional Paid-in Capital | Retained Earnings | Total |
|---|---|---|---|---|---|---|
| Balance, January 1, 2004 | $ - | $ - | $ 100 | $ - | $ - | $ 100 |
| Issuance of common stock | - | - | - | - | - | - |
| Net income | | | | | 10,380 | 10,380 |
| Dividends | - | - | - | - | - | - |
| Balance, December 31, 2004 | - | - | 100 | - | 10,380 | 10,480 |
| Issuance of common stock | 515,625 | 6,000,000 | - | - | - | 6,515,625 |
| Net income | | | | | 2,370,368 | 2,370,368 |
| Dividends | - | - | - | - | - | - |
| Balance, December 31, 2005 | $ 515,625 | $ 6,000,000 | $ 100 | $ - | $ 2,380,748 | $ 8,896,473 |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 4 -

**EXHIBIT "A"**

MIRABILIS VENTURES, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31, 2005 AND 2004
Increase (Decrease) in Cash and Cash Equivalents

| | 2005 | 2004 |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net income | $ 2,370,368 | $ 10,380 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Realized loss on investments | 4,281,879 | - |
| Realized gain on investments | (500,000) | - |
| Write off of bad debts | 1,396,500 | - |
| Depreciation and amortization | 87,291 | - |
| Changes in assets and liabilities: | | |
| Restricted cash | (13,756,018) | (993,982) |
| Accounts receivable | (1,779,701) | - |
| Unbilled receivables | 997,610 | - |
| Related party receivables | (3,494,189) | (878,750) |
| Inventory | (66,037) | - |
| Prepaid expenses | (1,552,162) | - |
| Other current assets | 25,905 | - |
| Deposits, non-current | (2,442,839) | - |
| Deferred income taxes | (28,431) | - |
| Goodwill | (1,432,400) | - |
| Other intangible assets | 6,018 | - |
| Other non-current assets | 80,492 | - |
| Accounts payable | 770,685 | - |
| Advanced billings | (161,562) | - |
| Related party payables | (876,287) | 830,000 |
| Accrued expenses | 584,132 | - |
| Deferred revenue | (2,000,000) | 2,000,000 |
| Income taxes payable | 1,556,864 | 2,252 |
| Other accrued liabilities | 292,364 | - |
| Minority interest | 46,329 | - |
| Total adjustments | (17,963,557) | 959,520 |
| Net cash provided by (used in) operating activities | (15,593,189) | 969,900 |
| **Cash flows from investing activities** | | |
| Purchases of property and equipment | (91,940) | - |
| Purchases of investments | (244,976) | (5,763,307) |
| Net cash used in investing activities | (336,916) | (5,763,307) |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of lines of credit | 75,274 | - |
| Proceeds from issuance of notes payable | 2,829,871 | 4,793,307 |
| Principal payments on notes payable | (2,693,438) | - |
| Proceeds from issuance of related party notes payable | 15,802,509 | - |
| Proceeds from issuance of common stock | 6,015,625 | 100 |
| Net cash provided by financing activities | 22,029,841 | 4,793,407 |
| Net increase in cash and cash equivalents | 6,099,736 | - |
| Cash and cash equivalents, beginning of year | - | - |
| Cash and cash equivalents, end of year | $ 6,099,736 | $ - |
| **Supplemental cash flow information** | | |
| Non-cash investing and financing transactions: | | |
| Acquisition of subsidiaries and equity method investees with debt financing | $ 6,940,890 | $ |
| Acquisition of subsidiaries with existing liabilities and equity | 22,821,576 | |
| Cash paid during the year for: | | |
| Income taxes | $ | $ |
| Interest | 318,718 | - |

The accompanying notes to consolidated financial statements
are an integral part of these statements.

- 5 -

# EXHIBIT "A"

(1)  **Basis of Presentation and Summary of Significant Accounting Policies:**

The following is a summary of the more significant accounting policies of Mirabilis Ventures, Inc. and subsidiaries (hereafter collectively referred to as the "Company"), which affect significant elements of the accompanying consolidated financial statements:

(a)  **Nature of operations**—Mirabilis Ventures, Inc. (hereafter referred to as the "Parent"), a company organized on November 3, 2003 under the laws of the State of Nevada, is a rapidly growing private equity holding company, which conducts its business through its operating subsidiaries. The Company is a diversified conglomerate and currently provides products and services in six business segments; Staffing and Human Resource Services Division, Business Consulting Services Division, Security Services Division, Construction Services Division, Manufactured Products Division, and Other Services Division.

For the year ended December 31, 2005, the Company's business segments are made up of the following companies:

| Division | Company | Acquisition Date |
|---|---|---|
| Staffing and Human Resource Services | Common Paymaster Corp | August 1, 2005 |
| | AEM, Inc. | April 29, 2005 |
| | National Med-Staff, Inc. d/b/a Premier HR | July 27, 2005 |
| | The Human Resource Enterprise Corporation | September 15, 2005 |
| | Payroll Concepts, Inc. | September 1, 2005 |
| Business Consulting Services | Nexia Strategy Corporation | April 15, 2005 |
| Security Services | Digiteyes Corporation | October 21, 2005 |
| | Gibraltar Integrity Incorporation | December 30, 2005 |
| | Security Imaging Systems, Inc. | November 8, 2005 |
| Construction Services | Quasar Construction, Inc. | August 10, 2005 |
| | The New Florida Industrial Electric, Inc. | September 5, 2005 |
| | RKT Constructors, Inc. | December 13, 2005 |
| Manufactured Products | Synergy Technology Fabrication, LLC | December 1, 2005 |
| Other Services | Siren Resources, Inc. | January 1, 2005 |
| | Ionic Services, Inc. | May 26, 2005 |
| | Legend Holdings of America, Inc. | June 9, 2005 |

**EXHIBIT "A"**

(1)  **Basis of Presentation and Summary of Significant Accounting Policies**: (Continued)

| Division | Company | Acquisition Date |
|---|---|---|
| Other Services (Continued) | Information Systems, Inc. | June 20, 2005 |
| | Creative Insurance Concepts, Inc. | July 28, 2005 |
| | P.R.B. Design Studio, Inc. | November 1, 2005 |
| | Pacific Atlantic STF Corporation | December 7, 2005 |
| | Empire Global Strategies, Inc. | December 15, 2005 |
| | General Analytics, Inc. | December 15, 2005 |

The Parent is considered part of the Business Consulting Services Division. None of the companies acquired in any of the business segments were disposed of in 2005.

For the year ended December 31, 2004, the only operating business segment was the Business Consulting Services Division, and consisted only of the Parent. No companies were acquired or disposed of in 2004.

(b)  **Principles of consolidation**—The consolidated financial statements include the consolidated accounts of the parent and its subsidiaries, and have been prepared in United States of America Dollars, and in accordance with generally accepted accounting principles in the United States of America (GAAP). All significant intercompany transactions have been eliminated in consolidation.

The Company consolidates companies in which it owns or controls more than fifty percent of the voting shares and variable interest entities in which the Company bears a majority of the risk to the entities potential losses or stands to gain from the majority of the entities expected returns. Investments in which the Company does not have a majority voting or financial controlling interest are accounted for under the equity method of accounting. The results of companies acquired or disposed of during the year are included in the consolidated financial statements from the effective date of acquisition or up to the date of disposal.

(c)  **Cash and cash equivalents**—For purposes of the statement of cash flows, the Company considers cash on hand and highly liquid investments with original maturities of three months or less to be cash and cash equivalents. These investments are recorded at cost, which approximates fair value.

(d)  **Receivables**—Accounts receivable and related party receivables are recorded at cost net of any allowance for doubtful accounts. Related fees and costs are immaterial to the receivable balances and are included in the face amount of the receivables. A general allowance for doubtful accounts is based on management's estimate of the collectibility of accounts receivable according to prior experience. There was an allowance for doubtful accounts on accounts receivable of $354,101 at December 31, 2005. There was no allowance for doubtful accounts on accounts receivable at December 31, 2004. Related party receivables are directly written off when deemed uncollectible. There was a write-off of approximately $1.9 million of related party receivables due from unconsolidated investees deemed uncollectible during the year ended December 31, 2005. No

EXHIBIT "A"

(1) **Basis of Presentation and Summary of Significant Accounting Policies**: (Continued)

related party receivables were deemed uncollectible during the year ended December 31, 2004. Financing receivables represent sales of installment contracts to various banks. Interest income generally is not recognized on past due loans unless the likelihood of further loss is remote.

(e) **Unbilled receivables**—The Company recognizes revenues within the Construction Services Group on the percentage-of-completion method. Costs and estimated revenues in excess of billings on uncompleted contracts are represented as unbilled receivables.

(f) **Allowance for doubtful accounts**—The Company carries accounts receivable at the amount it deems to be collectible. Accordingly, the Company provides allowances for accounts receivable it deems to be uncollectible based on management's best estimates. Recoveries are recognized in the period they are received. The ultimate amount of accounts receivable that becomes uncollectible could differ from that estimated.

(g) **Advanced billings**—Billings in excess of costs and estimated revenues on uncompleted contracts are represented as advanced billings and are recognized within the Construction Services Group for contracts under the percentage-of-completion method.

(h) **Inventories**—Inventories are stated at cost, determined on the first-in, first-out (FIFO) basis, which is not in excess of market.

(i) **Property and equipment**—Property and equipment are recorded at cost and depreciated using the straight-line method over the estimated useful lives of the respective assets, ranging from 3 to 20 years. Leasehold improvements are amortized over the life of the lease or the life of the improvement, whichever is shorter. Gains or losses on disposal of assets are credited or charged to income.

(j) **Impairment of long-lived assets**—The Company evaluates its long-lived assets and certain identifiable intangibles whenever events or changes in circumstances indicate that the carrying amounts of an asset may not be recoverable and estimated, future, undiscounted cash flows attributed to the assets are less than their carrying values.

(k) **Investments**—The Company uses the equity method to account for investments in investees when significant influence but not control over its operations exists. Under the equity method, the investment is recorded at cost and is adjusted to recognize the Company's proportional share of the investee's net income (loss). In addition, dividends received from the investee reduce the carrying value of the Company's investment.

In accordance with Statement of Financial Accounting Standards No. 115 (SFAS 115), "*Accounting for Certain Investments in Debt and Equity Securities*", the Company records investments classified as available-for-sale securities at fair value in other noncurrent assets on the consolidated balance sheets. Any change in the fair value of these securities is recorded in accumulated other comprehensive income (loss), unless such change is a decline in value that is deemed to be other than temporary.

The Company records investments classified as trading securities at fair value in current assets on the consolidated balance sheets and recognize changes in the fair value of these securities in Other Income (Expense) within the consolidated statements of operations.

**EXHIBIT "A"**

(1)  **Basis of Presentation and Summary of Significant Accounting Policies:** (Continued)

The Company evaluates its investments for impairment and adjusts the carrying amount of the investments when it is not recoverable and the fair value of the investments is less than their carrying values.

(l)  **Intangible assets**—The Company has adopted Statement of Financial Accounting Standards No. 142 (SFAS 142), *"Goodwill and Other Intangible Assets."* Under SFAS 142, goodwill and indefinite lived intangible assets are no longer amortized, but are reviewed for impairment annually. Intangible assets that are not deemed to have an indefinite life will continue to be amortized using the straight-line method over their useful lives. The Company evaluates the recoverability of goodwill and other intangible assets to determine whether an adjustment to carrying values is appropriate through a two-step process. In the first step, recoverability is determined by comparing the fair value of a reporting unit with its carrying amount, including goodwill. If the carrying amount of a reporting unit exceeds its fair value, the second step it performed to measure the amount of the impairment loss, if any; otherwise the reporting unit is considered not impaired and the test is complete. In the second step, if the carrying amount of reporting unit goodwill and other intangible assets exceeds the implied fair value of that goodwill or other intangible assets, an impairment loss will be recognized in an amount equal to that excess. No impairment of goodwill or other intangible assets was indicated during the years ended December 31, 2005 and 2004. The carrying value is based on management estimates of future operations. Future changes and conditions may occur, which could cause actual results to differ materially.

(m)  **Revenue recognition**—The Company recognizes revenue principally on four types of transactions; service fees charged to clients, subscriber service agreements, contract sales, and sales of products.

Revenue from the sale of services is recognized as services are rendered. The Company's revenues within the Staffing and Human Resource Division principally represent gross billings charged to clients and subscriber service agreements. Applicable worksite wages are recognized ratably over the period of service these employees perform at client worksites. Subscriber billings for services not yet rendered are deferred and recognized as revenue as the services are rendered, and the associated deferred revenue is included in current liabilities or long-term liabilities, as appropriate.

Revenues from contract sales, principally within the Construction Services Division are recorded primarily on the percentage-of-completion method. Profits on contracts in process are recognized based upon the estimated contract revenue and related cost to completion. Cost to completion is measured based on the ratio of actual cost incurred to total estimated cost. Revisions in cost estimates as contracts progress have the effect of increasing or decreasing profits in the current period. Provisions for anticipated losses are made in the period in which they first become determinable. This method is used because management considers job costs incurred to be the best available measure of progress on these contracts. Revenues from cost-plus-fee contracts are recognized on the basis of costs incurred during the period plus the fee earned. Because of the inherent uncertainties in estimating costs, it is at least reasonably possible that the Company's estimates of costs and revenues will change in the near term. Contract costs include all direct material and labor costs and those indirect costs related to contract performance, such as indirect labor, supplies, tools, repairs, and depreciation costs. Selling, general and administrative costs are charged to expense as incurred. Provisions for estimated losses on uncompleted contracts are made in the period in which such losses are determined. Changes in job performance, job conditions, and

EXHIBIT "A"

(1)  **Basis of Presentation and Summary of Significant Accounting Policies:** (Continued)

estimated profitability, including those arising from contract penalty provisions, and final contract settlements may result in revisions to costs and income and are recognized in the period in which the revisions are determined. An amount equal to contract costs attributable to claims is included in revenues when realization is probable and the amount can be reliably estimated.

Revenue from the sales of products is recognized at the time title and risks and rewards of ownership pass. This is generally when the products reach the free-on-board shipping point, the sales price is fixed and determinable, and collection is reasonably assured.

(n)  **Advertising costs**—The Company charges advertising costs to operations as incurred. Advertising costs, included in selling, general and administrative, totaled approximately $162,000 in 2005. The Company did not incur advertising costs in 2004.

(o)  **Deferred revenue**—In certain instances, customers pay for consulting services prior to services being rendered. These prepayments are recorded as deferred revenue. The Company may. be required to refund unused service revenue at the termination of a contract.

(p)  **Start-up costs**—Cost of start-up activities, including organizational costs, are expensed as incurred.

(q)  **Income taxes**—The Company accounts for income taxes in accordance with Statement of Financial Accounting Standards No. 109 (SFAS 109), *"Accounting for Income Taxes"*. Under this method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

(r)  **Use of estimates**—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates and assumptions include the allowance for doubtful accounts, the estimated percentage of completion of construction contracts, the carrying value of long-lived assets, and the recoverability of goodwill. Although management is not currently aware of any factors that would significantly change its estimates and assumptions in the near term, future changes and conditions may occur, which could cause actual results to differ materially.

(s)  **Recent accounting pronouncements**—The Financial Accounting Standards Board ("FASB") and other entities issued new or modifications to, or interpretations of, existing accounting guidance during 2005 and 2004. The Company has considered the new pronouncements, and other than as disclosed in these notes to the consolidated financial statements, does not believe that any other new or modified principles will have a material impact on the Company's reported financial position or operations in the near term.

EXHIBIT "A"

(1)   **Basis of Presentation and Summary of Significant Accounting Policies:**   (Continued)

(t)   **Going concern**—The accompanying consolidated financial statements of the Company have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the normal course of business. The Company has incurred substantial consolidated operating losses subsequent to December 31, 2005. A stockholder has committed financial support to the Company to allow it to continue activities for at least the following year, as needed. There can be no guarantee that the Company will be able to generate cash flow in the future or that the Company will be able to obtain financing. The consolidated financial statements do not include any adjustments relating to the recoverability of asset amounts or the amounts of liabilities should the Company be unable to continue as a going concern.

(2)   **Restricted Cash:**

Restricted cash as of December 31, 2005, includes a restricted certificate of deposit held as bank collateral for a letter of credit issued to a workers' compensation insurance company to cover worksite employees within the Human Resource Services Division.  This letter of credit and the underlying restricted certificate of deposit are renewable within 1 year or less. Restricted cash also includes the balance of an escrowed acquisition cash account maintained by legal counsel to effect capital transactions on behalf of the Company.  The balance of restricted cash is summarized as follows as of December 31:

|  | 2005 | 2004 |
|---|---|---|
| Restricted certificate of deposit | $   6,750,000 | $              - |
| Acquisition escrow account | 8,000,000 | 993,982 |
| Total restricted cash | $  14,750,000 | $   993,982 |

(3)   **Accounts Receivable:**

Accounts receivable at December 31, 2005 and 2004, are as follows:

|  | 2005 | 2004 |
|---|---|---|
| Construction services | $   11,976,222 | $            - |
| Security services | 262,402 | - |
| Manufactured products | 68,230 | - |
| Staffing and human resource services | 14,380 | - |
| Other services | 155,817 | - |
|  | 12,477,051 | - |
| Less: Allowance for doubtful accounts | (354,101) | - |
| Total accounts receivable, net | $   12,122,950 | $            - |

**EXHIBIT "A"**

(3)  **Accounts Receivable:**  (Continued)

Accounts receivable in the Construction Services Division as reported above at December 31, 2005 and 2004 includes contracts receivable summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Billed: | | |
| Completed contracts | $ 2,819,483 | $ - |
| Contracts in progress | 4,459,971 | - |
| Retained | 3,825,873 | - |
| Unbilled | 870,895 | - |
|  | 11,976,222 | - |
| Less: Allowance for doubtful accounts | (328,738) | - |
|  | $ 11,647,484 | $ - |

The Company's gross contracts receivable at December 31, 2005 and 2004, are summarized by funding source as follows:

|  | 2005 | 2004 |
|---|---|---|
| Federal government | $ - | $ - |
| State government | 2,050,698 | - |
| Local government | 8,197,780 | - |
| Commercial | 1,727,744 | - |
|  | $ 11,976,222 | $ - |

The Company has no policy requiring collateral or other security to support its contracts receivable, although it has statutory rights to file liens on real property for amounts owed the Company on nongovernmental contracts for which amounts due are not paid.

(4)  **Related Party Receivables:**

Related party receivables as of December 31, 2005 and 2004 are summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Non-interest bearing advances due on demand to unconsolidated investees | $ 31,406 | $ - |
| Due from entities under common shareholder ownership | 6,787,176 | 378,750 |
| Due from a minority shareholder of a consolidated subsidiary | 27,379 | |
| Due from a Company shareholder | - | 500,000 |
| Due from other related parties | 86,024 | - |
|  | $ 6,931,985 | $ 878,750 |

**EXHIBIT "A"**

(5)  **Investments, Current:**

Investments classified as available-for-sale are reported at fair value with unrealized gains and losses included in comprehensive income in accordance with FASB 115, and consist of the following as of December 31:

| | 2005 | 2004 |
|---|---|---|
| Common stock – publicly traded company | $ - | $ 3,907,149 |
| Public company debt security | - | 300,000 |
| Other investment | - | 200,000 |
| Total investments, current, at cost | - | 4,407,149 |
| Unrealized holding gains (losses) | - | - |
| Total investments, current, at fair value | $ - | $ 4,407,149 |

No unrealized gains or losses were recognized during the years ending December 31, 2005 and 2004. During the year ended December 31, 2005, the public company debt security was collected in full, the other investment was sold for no gain or loss to an unaffiliated third party, and the common stock of a publicly traded company was transferred to a third party in partial settlement for an indemnification agreement which together with services rendered resulted in consulting revenues of $12,302,952. In addition, during the year ended December 31, 2005, $2,822,631 of public company stock owned by a consolidated subsidiary acquired was written off as worthless, and a private stock investment of $500,000 was acquired and sold at a $500,000 gain.

(6)  **Property and Equipment:**

Property and equipment at December 31, 2005 and 2004, are as follows:

| | 2005 | 2004 |
|---|---|---|
| Machinery and construction equipment | $ 1,267,719 | $ - |
| Vehicles | 674,112 | - |
| Leasehold improvements | 149,385 | - |
| Furniture, office equipment and other | 117,787 | - |
| | 2,209,003 | - |
| Less: Accumulated depreciation | (77,161) | - |
| Property and equipment, net | $ 2,131,842 | $ - |

Depreciation expense for the years ended December 31, 2005 and 2004 was $77,161 and $0, respectively.

**EXHIBIT "A"**

(7)  Investments, Non-current:

The Company invests as a minority shareholder in both the equity securities of emerging growth businesses and distressed entities and leverages its shared services divisions to assist investees in turnaround consulting activities. As such, the Company has experienced a higher than usual level of realized losses in investments originally intended to be held long-term.

Equity investments in unconsolidated investees and the activity for the years ending December 31, 2005 and 2004 are summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Balance, beginning of year | $ 1,356,158 | $ - |
| Investments during the year | 6,581,183 | 1,356,158 |
| Realized losses on unconsolidated investees | (4,281,879) | - |
| Equity in earnings (loss) of unconsolidated investees recognized during the year | (72,900) | - |
| Investments transferred to consolidated subsidiary investments | (1,356,158) | - |
| Balance, end of year | $ 2,226,404 | $ 1,356,158 |

Realized losses of $4,281,879 and $0 for 2005 and 2004, respectively, are included in the total investment loss of $7,386,734 and $0 for 2005 and 2004, respectively, in the consolidated financial statements.

At December 31, 2005, the Company owned 20% or more of the equity ownership in A Very Private Eye, Inc. and FLHP-MS, LLC, owning equity interest of 25% and 50%, respectively. The Company's equity interest in these entities is reflected in the investment balances above. Summarized information on these entities at December 31, 2005 is as follows:

|  | Assets | Liabilities | Net income (loss) |
|---|---|---|---|
| A Very Private Eye, Inc. | $ 97,921 | $ 24,263 | $ (70,342) |
| FLHP-MS, LLC | 10,268,437 | 6,268,437 | - |

At December 31, 2004, the Company's only non-current investment was in Siren Resources, Inc., an entity that became a wholly-owned subsidiary in the Other Services Division in 2005.

(8)  Intangible Assets - Goodwill:

The Company had $3,520,872 of unamortized goodwill, which was subject to the provisions of Statement of Financial Accounting Standards No. 142 ("SFAS 142"). The Company assessed the impact of SFAS 142 and has determined that no material effect on the Company's financial position, results of operations or cash flows, including any impairment losses, would be required to be recognized. Under SFAS 142, the Company did not recognize any goodwill amortization expense during the years ended December 31, 2005 and 2004.

- 14 -

**EXHIBIT "A"**

(8)   **Intangible Assets - Goodwill:** (Continued)

The following table includes the components of goodwill at December 31, 2005 and 2004, and the activity for the year ended December 31, 2005:

| | Staffing & Human Resources Services Division | Business Consulting Services Division | Construction Services Division | Security Services Division | Other Services Division | Total |
|---|---|---|---|---|---|---|
| Balance, December 31, 2004 | $        - | $        - | $        - | $        - | $        - | $        - |
| Acquisitions | 222,166 | 500,000 | 1,538,337 | 56,223 | 1,204,146 | 3,520,872 |
| Impairment charges | - | - | - | - | - | - |
| Balance, December 31, 2005 | $ 222,166 | $ 500,000 | $ 1,538,337 | $ 56,223 | $ 1,204,146 | $ 3,520,872 |

(9)   **Other Intangible Assets:**

A security services patent for background checking automated through a drivers' license swiping device was acquired for $4,112 in November 2005, and a web based software product marketed in the Other Services Division was acquired in April 2005 for $106,123.  Amortization is being computed on a straight-line basis over 20 years for the security services patent and over 7 years for the web based software product and amortization expense for the year ended December 31, 2005, was $29 and $10,101, respectively.

The future amortization expense on the other intangible assets as of December 31, 2005 are summarized as follows:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $      5,894 |
| 2007 | 5,894 |
| 2008 | 5,894 |
| 2009 | 5,894 |
| 2010 | 5,894 |

**EXHIBIT "A"**

## (10) Related Party Payables:

The related party payables balances as of December 31, 2005 and 2004 are summarized as follows:

|  | 2005 | 2004 |
|---|---|---|
| Non-interest bearing balance payable to an unconsolidated investee resulting from unpaid services rendered principally at fair market value | $ 24,000 | $ - |
| Non-interest bearing balance payable to an entity under common shareholder ownership resulting from unpaid services rendered principally at fair market value | 4,737 | - |
| Non-interest bearing balance payable to the Company's controlling shareholder resulting from cash advances | - | 830,000 |
|  | $ 28,737 | $ 830,000 |

## (11) Operating Leases:

The Company is committed under operating leases on real property and equipment. The payments required under these commitments are as follows:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $ 741,856 |
| 2007 | 885,750 |
| 2008 | 894,794 |
| 2009 | 887,528 |
| 2010 | 714,367 |
| Thereafter | 1,912,045 |
|  | $ 6,036,340 |

The Company incurred rent expense for the years ended December 31, 2005 and 2004 in the amounts of $272,433 and $0, respectively.

The Company entered into an agreement with TenShi Enterprises, Inc., an entity under common shareholder ownership, to sell certain fixed assets of the Company on December 31, 2005. The Company subsequently leased these fixed assets back under leases dated April 1, 2006. The commitment associated with these leases is included above.

**EXHIBIT "A"**

(12) **Deferred Revenue:**

The deferred revenue balance as of December 31, 2004 consisted of $2,000,000 of an advance payment received on a management services contract of the Human Resource Services division, the revenue from which was recognized in 2005, and is included in consulting revenues. There were no deferred revenues as of December 31, 2005.

(13) **Concentrations of Credit Risk:**

Information related to significant concentrations of credit risk for financial instruments owned by the Company, except as otherwise disclosed, is as follows:

(a) **Demand deposits**—The Company had demand deposits related to its cash and cash equivalents accounts with bank balances of $7,162,178 and $0 at December 31, 2005 and 2004, respectively. The Company had demand deposits related to is restricted cash accounts with bank balances of $6,750,000 and $993,982 at December 31, 2005 and 2004, respectively (see Note 2). In addition, the Company had a deposit in an attorney escrow account of $8,000,000 at December 31, 2005. The Company has no policy requiring collateral or other security to support its deposits, although all demand and time deposits with banks are federally insured up to $100,000 by the FDIC. The Company places its cash and temporary investments with high credit quality financial institutions. At times, such investments may be in excess of FDIC insurance limits. The Company does not believe it is exposed to any significant credit risk on cash and cash equivalents.

(b) **Accounts receivable**—The Company has accounts receivable from trade customers, finance companies, related parties and manufacturers. The Company does not charge interest on outstanding receivables. The Company has no policy requiring collateral or other security to support its accounts receivable.

(14) **Letters of Credit:**

At December 31, 2005, the Company had one bank letter of credit of $6,750,000 outstanding. The letter of credit is collateralized by a certificate of deposit held by the bank and is due October 2006.

(15) **Lines of Credit:**

As of December 31, 2005, the Company has various bank lines of credit with a maximum available commitment of $1,585,000 and unused credit capacity of $1,509,726. Interest on $75,274 of unsecured bank lines of credit outstanding as of December 31, 2005 is due monthly at rates ranging from 6.44% to prime plus 3% (approximately 10.25% as of December 31, 2005). Included in the total bank lines of credit is a bank line of credit with an undrawn capacity of $1,500,000 as of December 31, 2005, which is available to the Company secured by assets of a construction subsidiary, and requires monthly interest only payments at 30 day LIBOR plus 2.75%, (approximately 7.14% as of December 31, 2005), and expires on September 7, 2007. Terms of the available bank lines of credit, among other covenants, requires maintenance of tangible net worth and certain financial ratios with which the Company is in full compliance as of December 31, 2005. The Company also has a related party line of credit with a maximum available commitment of $30,000,000, more fully described in Note 17.

**EXHIBIT "A"**

(16) <u>Notes Payable:</u>

Notes payable consist of the following as of December 31:

|  | 2005 | 2004 |
|---|---|---|
| **Secured installment notes payable** Due in monthly installments of principal and interest ranging from $421 to $3,062 per month at interest rates ranging from 0% to 7%, due through 2009, collateralized by vehicles and equipment of Construction Services Division subsidiaries | $ 238,524 | $ - |
| **Unsecured note payable to insurance company** Due in monthly installments of $100,000 with a balloon payment of $4,800,000 due August 30, 2008, which includes interest at 6.5% | 6,957,852 | - |
| **Unsecured installment note payable to an individual** Due in semi-monthly installments of $20,000 through November 30, 2010, which includes interest at 6.0% | 2,041,891 | 2,533,307 * |
| **Unsecured notes payable to an individual** Non-interest bearing note due in ten monthly installments of $100,000 through October 2006 | 1,000,000 | 2,260,000 * |
| **Bank note payable** Due in monthly installments of $30,918 for three months, then $49,782 until maturity at September 7, 2007, representing principal and interest at 7.09%, collateralized by unbounded accounts receivable of a Construction Services Division subsidiary | 924,501 | - |
| **Unsecured bank note payable** Due on demand at an interest rate of 7.75% | 100,000 | - |
| **Note payable to public company** Due in quarterly principal payments of $162,562 plus interest at prime plus 4% (11.25% as of December 31, 2005) through September 7, 2008, collateralized by assets of a Construction Services Division subsidiary | 1,788,187 | - |

**EXHIBIT "A"**

(16) Notes Payable: (Continued)

|  | 2005 | 2004 |
|---|---|---|
| Other notes payable | | |
| Due in monthly installments ranging from $726 to $8,333 at interest rates ranging from 0% to 5.75%, uncollateralized | $ 134,926 | $ - |
| Total notes payable | 13,185,881 | 4,793,307 |
| Less: Notes payable, current maturities | 3,609,222 | 1,751,416 |
| Total long term notes payable | $ 9,576,659 | $ 3,041,891 |

*As of December 31, 2004, these balances were non-interest bearing repayment commitments. During 2005 they were formalized as unsecured notes payable as referenced. Amounts have been presented as notes payable for comparability purposes.

The future maturities of these notes payable as of December 31, 2005, are summarized as follows:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $ 3,609,222 |
| 2007 | 2,385,338 |
| 2008 | 6,301,998 |
| 2009 | 461,296 |
| 2010 | 428,027 |
| Thereafter | - |
| | $ 13,185,881 |

The Company is current and in compliance with all covenants required by the applicable notes as of December 31, 2005.

(17) Related Party Notes Payable:

Related party notes payable consist of the following as of December 31:

|  | 2005 | 2004 |
|---|---|---|
| Note payable to investee minority shareholder, non-interest bearing, due on demand | $ 804,852 | $ - |
| Note payable to investee minority shareholder, non-interest bearing, due in three installments, with final payment due December 15, 2006 | 825,000 | - |

**EXHIBIT "A"**

(17) <u>Related Party Notes Payable:</u> (Continued)

|  | 2005 | 2004 |
|---|---|---|
| Note payable to an entity under common shareholder ownership supporting $30,000,000 line of credit, due in monthly installments of interest only at an annual rate of 7.2%, with a balloon payment due September 1, 2010, and the full $30,000,000 line is available through the maturity date | $ 17,258,340 | $ - |
| Note payable to controlling shareholder, non-interest bearing, due August 2006 | 79,300 | - |
| Note payable to an entity under common shareholder ownership, due in full on June 15, 2006 with accrued interest at 9.0% per annum | 1,750,000 | |
| Note payable to investee minority shareholder, interest at 6.0% per annum, $600,000 payment due June 13, 2006, with balance due December 13, 2006 | 1,200,000 | - |
| Total related party notes payable | 21,917,492 | - |
| Less: Related party notes payable, current maturities | 4,579,852 | - |
| Total long-term related party notes payable | $ 17,337,640 | $ - |

The future maturities of these related party notes payable are summarized as follow:

| Year Ending December 31 | Amount |
|---|---|
| 2006 | $ 4,579,852 |
| 2007 | - |
| 2008 | - |
| 2009 | - |
| 2010 | 17,337,640 |
| Thereafter | - |
| | $ 21,917,492 |

(18) <u>Stockholders' Equity:</u>

The Company has authorized the issuance of 75,000 shares of Class A Capital Common Stock ("Black Stock" or "Black Shares"), 1,000,000 shares of Class B Preferred Stock ("Green Stock" or "Green Shares"), 1,000,000 shares of Class P Preferred Stock ("Gold Stock" or "Gold Shares"), 400,000 shares of Class T Preferred Stock ("Platinum Stock" or "Platinum Shares"), and 25,000 shares of Class Z Preferred Stock ("Blue Stock" or "Special Preferred Stock" or "Blue Shares") (collectively, the "Shares"), all of which have no par value. The Green, Gold and Platinum Stock participate on an annual basis in a six percent (6%) non-cumulative preferred dividend. Each of the three classes of Black Stock, Green and Gold Stock collectively as a class of stock, and the Platinum Stock are entitled to one-third of

EXHIBIT "A"

(18) **Stockholders' Equity:** (Continued)

any additional distributions beyond non-cumulative preferential dividends. Green Stock may be exchanged on a share for share basis into Gold Stock, after the accumulation of a minimum of 3,000 Green shares and subject to the approval by a majority of Gold Stock shareholders. Similarly, Gold Stock may be exchanged on a share for share basis into Platinum Stock, after the accumulation of a 5,000 Gold shares and subject to the approval by a majority of Platinum Stock shareholders. No individual can own more than 5,000 Gold shares or 5,000 Platinum shares. Upon separation of services from the Company, bankruptcy or marital dissolution, Green, Gold, Platinum, and Blue Stock may, at the Company's option, be redeemed by the Company. Upon separation from service from the Company other than upon death of the shareholder, the optional redemption price of the Green Stock and Blue Stock is 50% of the face value of the applicable outstanding shares, for Gold Stock it is 80% of the face value of the applicable outstanding shares, and for Platinum Stock it is 100%. Green Stock has the right to vote only on the approval of an additional distribution and any such vote, which requires the approval of each class of shares. Gold Stock has the right to vote on all matters put to a vote of the shareholders, on subscription invitations to shareholders of Green shares for their exchange into Gold Stock, and for the authorization of additional distributions. Platinum Stock shall vote on all subscription invitations to shareholders of Gold shares for their exchange into Platinum Stock, on the approval of an additional distribution, and on any such vote which requires the approval of each class of shares. Black Stock shareholders have the ability to veto any decision made by the other classes of shareholders within twenty days of notice of said decision except the exchange to Gold or Platinum shares, or the authorization of an additional distribution. Blue Stock is subject to the special terms established by the Company's Board of Directors from time to time. However, Blue Stock shall not have voting rights, shall not be entitled to any distributions whatsoever, and will be subject to the optional redemption privileges as previously described.

On October 24, 2003 in exchange for $100 of services in kind, the Company issued 100 Black Shares. On February 10, 2005 the Company issued 500 Green Shares in exchange for a $500,000 payment on a non-interest bearing note previously issued in connection with the purchase by the Company of an investment. On February 28, 2005 the Company issued 2,000 Blue Shares in exchange for $500,000 of cash contributions and a $1,500,000 non-interest bearing note receivable. The note receivable was subsequently realized in the form of investments acquired and cash. On March 31, 2005 the Company issued 2,000 Blue Shares for $2,000,000 of cash contributions. On August 21, 2005 the Company issued 2,000 Blue Shares for $1,500,000 of cash contributions and 100% ownership of Nexia Strategy Corporation at an agreed upon purchase price of $500,000. On December 31, 2005 the Company issued 156,250 Green Shares to one shareholder, who subsequently transferred 155,750 Green Shares to a list of 78 shareholders approved solely by the original shareholder for an aggregate purchase price of $15,625.

No dividends were declared during the years ended December 31, 2005 and 2004.

(19) **Investment Gains (Losses):**

During the year ended December 31, 2005 investment gains (losses) consisted of equity investments in unconsolidated subsidiaries written off as worthless in the amount of $4,281,879, public company stock written off of $1,957,631, and $1,629,224 of unrecoverable advances to investees net of a $500,000 gain on the sale of a private equity investment.

**EXHIBIT "A"**

## (20) Income Taxes:

The following table presents the income tax provision from continuing operations for the years ended December 31:

|  | 2005 | 2004 |
|---|---|---|
| Federal | $ 1,266,984 | $ 1,832 |
| State | 305,630 | 420 |
| Total current | 1,572,614 | 2,252 |
| Deferred: |  |  |
| Federal | (24,786) | - |
| State | (3,645) | - |
| Total deferred | (28,431) | - |
| Total provision for income taxes | $ 1,544,183 | $ 2,252 |

The primary temporary difference which gives rise to the deferred tax assets for the year ended December 31, 2005 relates to equity in net loss of unconsolidated subsidiaries. At December 31, 2005 and 2004, the current tax liability was $1,574,866 and $2,252, respectively. At December 31, 2005, the deferred tax asset was $28,431.

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the projected future taxable income and tax planning strategies in making this assessment. As of December 31, 2005 and 2004, the Company determined a valuation allowance was unnecessary.

For the years ended December 31, 2005 and 2004, the effective tax rate approximated the statutory rate.

## (21) Significant Customer:

During the years ended December 31, 2005 and 2004, all of the consulting revenues and sales commissions were generated by a single public company customer that is related by common shareholder ownership, which were approximately 89% and 100%, respectively, of total revenues. In addition, during 2005 the Company recognized a $1,957,631 loss on the investment in common stock of this significant customer.

## (22) Commitments:

The Company has committed to acquire various companies, real estate and other acquisitions. The deposits for these acquisitions are included in deposits, non-current.

**EXHIBIT "A"**

(23) <u>Variable Interest Entities – FIN 46(R):</u>

In December 2003, the Financial Accounting Standards Board (FASB) issued revised Interpretation 46(R) (FIN 46(R)), "*Consolidation of Variable Interest Entities*". FIN 46(R) requires that a company that holds variable interests in an entity consolidate the entity if the company's interest in the variable interest entity (VIE) is such that they will absorb a majority of the VIE's expected losses and/or receive a majority of the VIE's expected residual returns, if they occur. The Company is related to numerous unconsolidated investees and entities under common shareholder ownership. The Company is involved with various entities described in Notes 4, 5, 7, 11, 17 and 21 that may qualify as variable interest entities. While management believes that it has performed an appropriate analysis to identify whether it is the primary beneficiary of all potentially material variable interest entities, the ultimate determination is very subjective and sufficient information may not always be available.

(24) <u>Minority Interest:</u>

The Parent acquired less than 100% ownership in certain subsidiaries during 2005, summarized as follows:

|  | Shares | Percentage Ownership |
|---|---|---|
| The New Florida Industrial Electric, Inc. | 75 | 75% |
| RKT Constructors, Inc. | 48 | 80% |
| Security Imaging Systems, Inc. | 1,299 | 50% |
| Empire Global Strategies, Inc. | 500 | 50% |
| Ionic Services, Inc. | 400,000 | 80% |

The Company has eliminated investment in these subsidiaries and all intercompany transactions in consolidation.

At December 31, 2005, the minority interest in equity and in earnings is as follows:

|  | Minority interest in equity | Minority interest in earnings |
|---|---|---|
| The New Florida Industrial Electric, Inc. | $ 43,138 | $ 43,138 |
| RKT Constructors, Inc. | 1,465 | 1,465 |
| Security Imaging Systems, Inc. | 1,701 | - |
| Empire Global Strategies, Inc. | 25 | - |
| Ionic Services, Inc. | - | - |
|  | $ 46,329 | $ 44,603 |

(25) **Contracts in Progress:**

Information with respect to contracts in progress in the Construction Services Division at December 31, 2005 and 2004 is as follows:

|  | 2005 | 2004 |
|---|---|---|
| Costs incurred on uncompleted contracts | $ 33,013,330 | $ - |
| Estimated earnings thereon | 5,914,405 | - |
|  | 38,927,735 | - |
| Less: Billings to date | 35,929,038 | - |
|  | $ 2,998,697 | $ - |

Included in the accompanying consolidated balance sheets under the following captions:

|  | 2005 | 2004 |
|---|---|---|
| Unbilled receivables | $ 3,553,401 | $ - |
| Advance billings | (554,704) | - |
|  | $ 2,998,697 | $ - |

The gross revenue on work to be performed on signed contracts at December 31, 2005 is approximately $28,400,000. The Company had no backlog at December 31, 2004.

(26) **Workers' Compensation Costs:**

A subsidiary in the Staffing and Human Resource Services Division entered into a workers' compensation program on August 1, 2005 with an insurance company through August 1, 2006. The program provides insurance coverage for claims incurred in each plan year but which will be paid out over future periods. The Company added a related entity under common shareholder ownership as an additional insured to this policy. (See Note 28 regarding the transfer of the related entity's book of business). The subsidiary has made certain deposits on this workers' compensation and employers' liability policy.

Workers' compensation expense for the year is included in Payroll Service Direct Expenses and is based upon premiums paid to the carrier for the current year coverage, estimated total cost of claims to be paid by the Company that fall within the policy deductible, the administrative costs of the programs, the return on investment premium dollars paid as part of the program and the discount rate used to determine the present value of future payments to be made under the program. Additionally, any revisions to the estimates of the prior year loss sensitive programs are recognized in the current year. A workers' compensation receivable (liability) is established when premium dollars paid into the plan are in excess of (less than) required reserves. Because of the inherent uncertainties in estimating costs, it is at least reasonably possible the Company's estimates of costs and liabilities will materially change in the near term.

**EXHIBIT "A"**

(26) Workers' Compensation Costs: (Continued)

The subsidiary has obtained a calculation of the estimated cost of claims incurred based on the subsidiary's current and historical loss development trends, which is used in the subsidiary's development of overall loss estimates related to each open policy year. Any loss is to be reimbursed by the related entity covered under the program for the year ending December 31, 2005. The Company is subject to certain risks associated with the workers' compensation policy and the actual loss incurred under the policy.

(27) Employee Benefit Plans:

Certain subsidiaries of the Company provide 401(k) profit sharing plans that are available to all employees who have satisfied certain eligibility requirements. Employee contributions are discretionary. The Company subsidiaries may match employee contributions and may also make general discretionary contributions for all eligible employees based upon their total compensation. The total Company match was $6,492 for the year ended December 31, 2005.

(28) Subsequent Events:

In addition to the sale-leaseback transactions disclosed in Note 11, the Company entered into eight additional operating leases beginning in April 1, 2006 with the same related entity under common shareholder ownership. The annual rents range from $20,152 to $336,000 with initial annual rents totaling approximately $921,000. The lease expiration dates range from March 2008 to August 2010.

The Company entered into transactions to acquire additional subsidiaries in 2006.

(29) Litigation:

A subsidiary in the Construction Services Division reached an agreement in 2006 with the prior owner of the company to pay an additional $900,000 as a "true up" to the purchase price of the stock. The amount will be paid in $100,000 increments plus interest at 9% through April 2008. Upon final execution, management expects to record the additional amount as goodwill. There is currently no goodwill recorded for this subsidiary.

In the normal course of business, the Company is subject to certain claims or lawsuits. Management is not aware of any claims or lawsuits that will have a material or adverse effect on the consolidated financial position or results of operations of the Company. However, depending on the amount and timing of an unfavorable resolution of the claims or lawsuits, it is possible that the Company's financial condition, results of operations, or liquidity could be materially affected.

EXHIBIT "A"

**(30) Related Party Transactions:**

In addition to the related party transactions disclosed in Notes 4, 17, 18, 21, and 28, the Company entered into the following related party transactions during the year ended December 31, 2005. The Company paid consulting fees to a controlling shareholder in the amount of $1.5 million. In addition, the Company paid consulting fees to certain shareholders in the amount of approximately $1.4 million. The Company also incurred $100,000 in expenses related to Capital Genesis to a controlling shareholder, of which $79,300 is included in related party notes payable.

EXHIBIT "A"